In the Matter of the Application of THE COLLEGE OF THE CITY OF NEW YORK for a Mandamus Order against JOHN F. HYLAN, CHARLES L. CRAIG, MURRAY HULBERT, JULIUS MILLER, HENRY BRUCKNER, EDWARD RIEGELMANN, MAURICE E. CONNELLY and JOHN A. LYNCH, Constituting the Board of Estimate and Apportionment of the City of New York.

Supreme Court, New York Special Term, February, 1923.

New York city — mandamus — power of board of trustees to fix salaries in College of the City of New York — duty of board of estimate and apportionment to comply with schedule of trustees — right of president of college to occupy house in addition to salary.

Any city activity or enterprise that is reasonably calculated to promote the happiness and general welfare of the people of a given community is serving a "city purpose" as that term is used in section 10 of article 8 of the Constitution of this state.

The history of the College of the City of New York, which for seventy-five years last past has furnished and still furnishes free educational facilities in the higher branches of learning, and the legislation affecting it during that period, amount to a practical construction of the constitutional provision in question, that the college is supplying a city need and that moneys expended for its maintenance are paid for a "city purpose."

The statute (Laws of 1921, chap. 120) which permits the trustees of the college to fix the compensation of the faculty and employees of the college, is not obnoxious to the inhibition of section 10 of article 8 of the Constitution of the state, that no city shall be allowed to incur "any indebtedness except for city * * * purposes," because it requires the use of city moneys to maintain the college.

The president of said college is permitted to occupy without charge a house adjacent to the college grounds and owned by the city, the purchase of which was duly authorized in 1907 for the express and stated purpose of providing a residence for the president and since that year the building has been occupied by the successive presidents of the collége. *Held*, that the contention of the corporation counsel, in support of his claim that the statute is unconstitutional, that

if the sum of an adequate rental were added to the money compensation fixed for the president's salary, the total of his compensation would exceed the statutory maximum, was not deserving of extended consideration.

An application by the college for an order of mandamus requiring the board of estimate and apportionment to revise the city budget for the year 1923 by increasing the appropriations for compensation of the faculty and employees of the college so as to comply with the salary schedule compiled by the trustees of the college and presented to the board of estimate pursuant to statute, granted.

Whether a statute is constitutional will not be considered unless the question is raised in a court of first instance and when not so raised, neither the doctrine of *res adjudicata* nor the rule of *stare decisis* has any application.

Application for mandamus.

*Davies, Auerbach & Cornell (Charles H. Tuttle* and *Carl E. Peterson,* of counsel), for petitioner.

*George P. Nicholson (William E. C. Mayer,* of counsel), for respondent.

Mullan, J.  The College of the City of New York makes this application for an order of mandamus requiring the board of estimate and apportionment of the city of New York to revise the city budget for the year 1923 by increasing the appropriations for compensation of the faculty and employees of the college so as to comply with the salary schedules compiled by the trustees of the college and presented to the board pursuant to statute.  The sufficiency of the trustees' requisition as to form, timeliness and other technical requirements is not challenged.  Nor, except in respect of the salary of the president of the college, is it claimed on behalf of the city that the college trustees have exceeded the compensations which the legislature, by chapter 120 of the Laws of 1921, permitted the trustees to fix, the city resting its claim of right to refuse to appropriate the sums fixed by the trustees upon the contention that the statute referred to is void for unconstitutionality.  I shall first consider the city's point that the fixation by the trustees of the salary of the president of the college was of a sum in excess of the maximum allowed by the act.  The ground of this contention is that the president is permitted to occupy without charge a house owned by the city, situate adjacent to the college grounds, and that if the sum of an adequate rental were to be added to the money compensation fixed for the president the total of his compensation would be in excess of the statutory maximum.  I think the point is not deserving of extended consideration.  The statute speaks merely of money compensation. The board of estimate in 1907 authorized the purchase of the house in question for the express and stated purpose of providing a residence for the president, and the building has been occupied

Supreme Court, February, 1923. [Vol. 120

continuously since that year by the successive presidents of the college. There was, apparently, no hint or thought of a rental charge, and I think it is quite evident that it was the intention of the various city officials who had to do with the matter to follow a custom, very prevalent throughout the country, of providing for the head of an institution of higher learning a residence on or near the grounds of the institution so as better to enable him to perform the onerous and time-exacting duties of his office. I hold that the city's point in this regard is not well taken. The main and practically the sole contention made by the learned corporation counsel in support of his claim that the act of 1921 is unconstitutional, is that the statute by requiring the use of city moneys to maintain the college, is obnoxious to the provision of section 10 of article 8 of the state Constitution: " nor shall any * * * city * * * be allowed to incur any indebtedness except for city * * * purposes." This point is here made for the first time, although the city has unsuccessfully assailed the statute upon other than constitutional grounds. *People ex rel. Col. of City of N. Y.* v. *Hylan,* 116 Misc. Rep. 334; affd., 198 App. Div. 998. I cannot assent to the proposition advanced by the learned counsel for the petitioners that the decision referred to forecloses the city from raising the constitutional question. It is elementary that constitutional questions will not be considered unless they are raised, and raised, too, in the court of first instance; and it must follow that when a constitutional question is not so raised neither the doctrine *res adjudicata* nor the rule *stare decisis* can be applicable, as the constitutional point was not only not necessarily involved, but could not properly have been considered. It is the city's contention that the College of the City of New York is an institution of higher learning, that the maintenance of such an institution is not an activity " within the ordinary range of municipal action," that it does not promote any of the " objects for which cities are primarily organized," that the college thus does not serve a city purpose and that, therefore, the legislature was inhibited by the Constitution from compelling the city to pay out moneys for its maintenance. The city's position, in brief, is that it has the right to maintain the college, although the college does not serve a city purpose, and that the state has not the right to interfere with the city's management of the college in so far, at least, as such interference may take the form of overriding the judgment of the governing officials of the city in respect of the compensation that should be received by the faculty and employees of the college. It is true that that position is not taken clearly and certainly is not stated in the terms I have used, but when subjected to analysis.

the contention of the city seems to come to that and nothing more, or else I have been unable to understand the argument advanced on its behalf. It is the contention of the petitioners that the college is a part of the city's system of common-school education, and thus that it serves a city purpose (the city acting on familiar principles as a so-called state agency), as does every public grammar school; and that the college, whether or not it can properly be regarded as a part of the common-school system, fills a municipal need and serves a city purpose, as the term is employed, in the organic law of the state. In 1846 the board of education of the then city of New York, influenced thereto by an apparently insistent public demand, memorialized the legislature to establish a free college or academy, and the legislature, in compliance with the memorial, enacted in 1847 (chap. 206) a statute incorporating a free academy, as it was named, conditioned, however, upon the approval of the voters of the city. By an overwhelming majority the electors of the city voted for the establishment of the college. In 1866 (chap. 264) the name of the institution was changed to that of " The College of the City of New York." Throughout its history of seventy-five years the institution has been made the subject of numerous legislative enactments. City and state have co-operated through that long period in extending a fostering care to the little academy that has grown with the years into the splendid institution of learning of the present day. For seventy-five years there has not been a suggestion that the college was not fulfilling a proper city purpose. If, then, the question whether the college is serving a city purpose is to be decided in the light of the views and thoughts of the people who for seventy-five years have been paying for its maintenance, and of the legislators who have enacted succeeding statutes to see that it is properly supported and maintained, and of the governing officials of the city itself, who have built the college up from its small beginning to its present high state, the answer would seem to be simply arrived at and conclusively made. The history of the college, including the legislation affecting it, for this considerable period of seventy-five years, amounts, I think, to a practical construction of the constitutional provision in question, that the college is supplying a city need and that moneys expended for its maintenance are paid for a city purpose. *People ex rel. Einsfeld* v. *Murray*, 149 N. Y. 357, 376. I do not think, however, that a holding to that effect need be, or should be, based solely upon the theory of long assent and acquiescence. Let us suppose that the college had been organized only last year, by act of the legislature, approved by the vote of the electorate. Would the statute offend against the constitutional provision in

question? I think not. It is not easy to define the phrase " city purpose." As was said by Judge Vann in *Matter of Chapman* v. *City of New York*, 168 N. Y. 80, 86: " The courts have found it difficult to define a county, city, town or village purpose, and have, as a rule, proceeded by the process of exclusion," In *Sun Publishing Assn.* v. *Mayor*, 152 N. Y. 257, 265, Judge Haight said: " Generally, we think, the purpose must be necessary for the common good and general welfare of the people of the ʳmunicipality, sanctioned by its citizens, public in character and authorized by the legislature." The primary object of the draftsman of the constitutional provision was to prevent the use of public moneys for private gain. There is here, of course, no pretense or suggestion of private gain. That the character of the object was public would be undeniable. It would have been authorized by the legislature. It would have been sanctioned by the citizens. Thus we come to the last of the tests laid down by Judge Haight in the *Sun Publishing Assn. Case, supra,* namely, " that the purpose must be necessary for the common good and general happiness of the people of the municipality." I think the employment of the word " necessary " was unfortunate, and that it was noᵗ intended that it should be taken in its strict or most usual sense. Undoubtedly the city could exist and prosper without a free college for the use of its denizens. So, too, could the city manage to survive, with a reasonably comfortable body of citizens, if we had no free baths, no free band concerts, no free recreation piers and the like. But no intelligent person would contend seriously, in respect of such a municipal activity as one of those I have just mentioned, that it was not serving a proper city purpose. I think it is safe to say that any city activity or enterprise that is *reasonably calculated* to promote the happiness and general welfare of the people of a given community is serving a " city purpose," as the term is used in the Constitution, provided the other elements I have referred to are present. Would, then, the supposititious college of 1922 foundation of which I am speaking be reasonably calculated to promote the happiness and welfare of the people of the city? I can see but one answer, and that is yes. It is impossible to state the beneficial results of such an institution without stating the obvious. Young men who are desirous of grounding themselves for the professions, or who, for other proper reasons, are eager to advance beyond the high schools, and who are without the means to enable them to enroll at the great out-of-town or city universities, would be denied the opportunity for a college education if free municipal institutions of learning, like the City College, are not to be permitted to exist. In this day and age no time need be

wasted in stating the value and advantages of education, not merely to those who are educated, but to the communities that in turn receive the benefits of that education from those who were its immediate recipients. The states have for many years been furnishing free educational facilities in the higher branches of learning. Why may a city, which, in most of its activities, operates merely as a state agency, not do the same? The city argues that while institutions of higher learning serve a public purpose they do not serve a city purpose, for the reason that cities in the past have not commonly furnished free advanced education and that the general usage and course of municipal administration and activity throughout the country must be reckoned with. It is true that while " a city purpose is of necessity a public purpose " (Vann, J., in *Matter of Chapman* v. *City of New York, supra,* at page 87) the converse is not so, and a public purpose is not necessarily a city purpose. It is also true that the United States Supreme Court has laid it down that in determining what is a public purpose, and incidentally what is a city purpose, courts " must be governed mainly by the course and usage of the government, the objects for which taxes have been customarily and by long course of legislation levied, what objects or purposes have been considered necessary to the support and for the proper use of the government, whether state or municipal. Whatever lawfully pertains to this and is sanctioned by time and the acquiescence of the people may well be held to belong to a public use and proper for the maintenance of good government, though this may not be the only criterion of rightful taxation." *Loan Association* v. *Topeka,* 20 Wall. 655, 664, quoted by Vann, J., in *Matter of Chapman* v. *City of New York, supra,* 87. The corporation counsel does not say, but seems to assume, that no other American city has ever established an institution of higher learning, and argues upon the basis of that assumed fact that the establishment of the City College was outside of the usage and general course of municipal government. Conceding the importance generally of that consideration, I think it should not prove to be a stumbling block in the way of the supposed 1922 college foundation presently under discussion. There are limitations to the respect to be paid to the past. Different times, different manners. There are many things done to-day by cities, and by governmental agencies generally, for the advancement of the welfare of the people that would not have been permitted only a few years ago. If, fifty years ago or less, a legislator had proposed a workman's compensation bill he would have been laughed at. It is a common saying that the most advanced of the public men of a few years ago would be

classed as conservatives or reactionaries to-day if they stood still while the unceasing stream of progress flowed on. As far in the future as the mind's eye may be permitted to see there must be a continuous series of beginnings of new and theretofore untried means of doing what society and governments are organized to accomplish; and it will not do to say when a new project is launched that seems to be natural and proper and calculated to promote happiness and general good that it cannot be permitted merely because no such thing was ever before attempted by a governmental agency. The phrase " city purpose," as employed in the Constitution, must, I think, be given a construction that fits not only the time but the place. It is possible that if a small and poor village were to seek to establish a college it could be said that the enterprise would not serve a " village purpose." New York, if not the richest and the most magnificent of the cities of the world, as many believe it to be, is at least a very great and a very rich city, and many things are proper for it to do that might not be proper in the case of a small and poor community. I think there is little room for doubt that it is proper and eminently desirable for this city to maintain free institutions of higher learning like the College of the City of New York. If, therefore, the constitutional question before me had arisen with respect to a wholly new attempt to establish a free college within the city I would be prepared to hold that such an institution was calculated to serve a city purpose. When, to the force of the pertinent arguments upon principle alone there is added the history of the College of the City of New York to which I have adverted, I am of the opinion that there is left no particle of room for doubt that the college is, and has been for seventy-five years, actually serving a city purpose. As I have intimated, the argument upon behalf of the city was not altogether clear to me in one particular. Much of importance was ascribed, seemingly, to the fact that the statute of 1921 was mandatory in character, *i. e.*, it did not permit, but compelled, the city to pay increased salaries to the college faculty and employees. It would seem to be the understanding of the city authorities that the constitutional provision in question would invalidate a mandatory statute, but would not invalidate a permissive statute. Such a contention clearly would be untenable. The legislature may do anything in its control of cities that it is not prohibited by the Constitution from doing (*Matter of McAneny* v. *Bd. of Estimate*, 232 N. Y. 377; McBain, Law and Practice of Municipal Home Rule, 15, 16), but it is expressly prohibited by section 10 of article 8 from giving its assent to the incurring by a city of indebtedness for other than a " city purpose." I repeat the words of the

Constitution: "Nor shall any * * * city * * * be allowed to incur any indebtedness except for * * * city * * * purposes." While the legislature may *compel* the city to incur indebtedness for a city enterprise that is properly serving a city purpose, it is powerless, under the Constitution, either to compel or to *permit* a city to incur indebtedness for any enterprise that does not serve a city purpose. If the purpose is not a city purpose the legislature is as impotent as the city. If the purpose is a city purpose the legislature is all powerful. The city authorities are willing to continue to maintain the College of the City of New York if they are to be permitted to fix the salaries of the faculty and employees of the college. If, however, their own contention in this proceeding were to be upheld, that the college is not serving a city purpose, it would necessarily follow that the college is an illegal institution; that every dollar that has been expended by the city for its maintenance has been expended without warrant of law and that the institution should be closed immediately. If I am right in deciding that the college is serving a city purpose, it follows that the city must yield to every mandate of the legislature in relation to the college unless any such mandate is inhibited by some other constitutional provision. I have examined and considered the other contentions made on behalf both of the city and of the college and I find none that, in my judgment, requires discussion. Let the mandamus issue. Settle order.

Ordered accordingly.