In the Matter of the Application of THE COLLEGE OF THE CITY OF NEW YORK, Respondent, for a Mandamus Order against JOHN F. HYLAN and Others, Constituting the Board of Estimate and Apportionment of the City of New York, Appellants.

In the Matter of the Application of HUNTER COLLEGE OF THE CITY OF NEW YORK, Respondent, for a Mandamus Order against JOHN F. HYLAN and Others, Constituting the Board of Estimate and Apportionment of the City of New York, Appellants.

First Department, May 4, 1923.

Municipal corporations — city of New York — money appropriated for support of College of City of New York and Hunter College of City of New York is for city purpose within Constitution, art. 8, § 10 — Constitution, art. 9, § 1, does not limit support to common schools only — laws providing for establishment and support of said colleges are constitutional — Laws of 1921, chap. 120 (Education Law, § 883, subd. C), not invalid on ground that it confers local legislative powers upon board of trustees of said colleges — Constitution, art. 3, §§ 26 and 27, and art. 10, § 2, construed — board of estimate and apportionment is under mandatory duty to appropriate amount required by trustees of said colleges to meet salaries and other expenses — city cannot deduct rental of house purchased by it for use of president of City College.

A tax levied for the maintenance of the College of the City of New York and for Hunter College of the City of New York, both of which are institutions of higher learning, is a tax for a city purpose within the meaning of section 10 of article 8 of the Constitution.

Section 1 of article 9 of the Constitution, providing that the Legislature shall provide for the maintenance and support of a system of free common schools, is not a limitation of authority but merely fixes the minimum duty of the Legis-

lature and in no way prevents the maintenance by taxation of institutions of higher learning.

The laws providing for the establishment and support of the College of the City of New York and Hunter College of the City of New York are a constitutional exercise of the power granted to the Legislature and, having been ratified and confirmed by the people of the city of New York, cannot now be questioned.

Local legislative powers were not conferred on the board of trustees of the said colleges in violation of sections 26 and 27 of article 3 and section 2 of article 10 of the Constitution by chapter 120 of the Laws of 1921 (Education Law, § 883, subd. C), which established a classification and schedule of salaries to be paid to the officers of administration and instruction and other employees of any college in which the compensation and salaries are paid directly out of the moneys appropriated by the board of estimate and apportionment in cities of one million or more inhabitants, and which provides also that the board of trustees of such institutions shall adopt schedules which shall fix the compensation of members of the teaching or supervisory staff and other employees, and make out payroll budgets in accordance with the provisions of the act, and that the board of estimate and apportionment shall appropriate annually an amount sufficient to pay the salaries so fixed.

The board of estimate and apportionment is under a mandatory duty to appropriate the amount required by the trustees of the College of the City of New York and Hunter College of the City of New York to meet the salaries and other expenses, and accordingly a peremptory mandamus order will be granted directing the board of estimate and apportionment of the city of New York to revise the budget for 1923 and to increase the appropriation for the payment of salaries of the officers of administration and instruction and other employees of the said colleges to equal the amount required by the board of trustees thereof.

The city of New York cannot deduct from the salary of the president of the College of the City of New York the rental value of the residence which the city purchased in 1907 for the express and stated purpose of providing a residence for the president.

APPEAL in each of the above-entitled proceedings by the defendants, John F. Hylan and others, from a peremptory mandamus order of the Supreme Court, made in each proceeding at the New York Special Term and entered in the office of the clerk of the county of New York on the 2d day of March, 1923, directing the defendants to revise the 1923 New York city budget, and to increase the appropriation for the payment of salaries of the officers of administration and instruction and other employees of the petitioners.

*George P. Nicholson,* Corporation Counsel [*William E. C. Mayer* of counsel], for the appellants.

*Davies, Auerbach & Cornell* [*Charles H. Tuttle* of counsel], for the respondent College of the City of New York.

*Carl E. Peterson,* for the respondent Hunter College of the City of New York.

PAGE, J.:

Although the orders appealed from only direct an increase of the amount already appropriated by the board of estimate for

the support and maintenance of these two institutions of learning, the officials of the city take the position and argue that no sum can be legally appropriated for the support of these institutions. The first point in the brief of the corporation counsel is: " A tax levied for the maintenance of an institution of higher learning, conferring degrees and subject to the provisions of the Education Law relative to colleges, is not a tax for a city purpose within the meaning of Article VIII, Section 10, of the State Constitution."

It is not urged that the city lacks power to appropriate money for the elementary education of the children of its inhabitants. But that is the limit that the present administration seeks to put upon free education. When a similar contention was advanced in the Supreme Court of Michigan, that court said: " When this doctrine was broached to us, we must confess to no little surprise that the legislation and policy of our State were appealed to against the right of the State to furnish a liberal education to the youth of the State in schools brought within the reach of all classes. We supposed it had always been understood in this State that education, not merely in the rudiments, but in an enlarged sense, was regarded as an important practical advantage to be supplied at their option to rich and poor alike, and not as something per- taining merely to culture and accomplishment to be brought as such within the reach of those whose accumulated wealth enabled them to pay for it." (*Stuart* v. *School District,* 30 Mich. 69, 75.)

Judge Cooley thus states what has been generally accepted as a fundamental principle of taxation for the purpose of free educa- tion: " It may be safely declared that to bring a sound education within reach of all the inhabitants has been a prime object of American government from the very first. It was declared by colonial legislation, and has been reiterated in constitutional pro- visions to the present day. It has been regarded as an imperative duty of the government; and when question has been made concern- ing it, the question has related not to the existence of the duty, but to its extent. But the question of extent is one of public policy, and addresses itself to the Legislature and the people, not to the courts." (Cooley Taxation [3d ed.], 198.) Bearing in mind that the extent of education to be freely provided " is one of public policy and addresses itself to the Legislature and the people," we turn to the action of the Legislature and the people to find a declaration of that policy with reference to these two colleges.

By chapter 206 of the Laws of 1847 the Legislature gave power to the board of education of the city and county of New York to establish a free academy in the city of New York, for the purpose of extending the benefits of education gratuitously to persons who

had been pupils in the common schools of the city and county of New York. The act further provided that the board of supervisors of the city and county of New York should annually raise and collect by tax upon the inhabitants of the city and county, at the same time and in the same manner as the contingent charges of the said city and county were raised and collected, such sum as the board of education should by resolution declare to be necessary, in addition to others which might be appropriated to them, for the maintenance and support of the Free Academy. The act further provided: " The said free academy shall be under the supervision, management and government of the said board of education. The said board of education shall from time to time, make all needful rules and regulations, to fix the number and compensation of teachers and others to be employed therein."

The act contained many other provisions not material to the question under consideration, and finally provided: " At the election to be held on the first Monday of June next, for the election of school officers, the question whether such academy shall be established, according to the provisions of this act, shall be submitted to the people. Should there be a majority of votes in its favor, it shall be the duty of the board of education forthwith to take measures to carry the provisions of this act into operation, and should there be a majority of votes against it, then this act shall be void and of no effect." The question of the establishment of the Free Academy was submitted to the electorate of the city and adopted by a majority of between five and six to one.

Thus not alone was the public policy declared by the Legislature and ratified by the people that an institution be established where those who had attended the common schools of the city could obtain a collegiate education, but also that the board of education of the city should fix the compensation of its employees, and the sum so fixed should be raised by the proper authorities by taxation. In 1851 the Legislature passed an act entitled " An act to amend, consolidate and reduce to one act, the various acts relative to the common schools of the city of New-York " (Laws of 1851, chap. 386), in which, among the powers and duties of the board of education was " To continue to furnish through the free academy, the benefit of education, gratuitously, to persons who have been pupils in the common schools of the said city and county, for a period of time to be regulated by the board of education not less than one year. * * * To * * * fix the number and compensation of teachers and others to be employed therein."

Provision is also made for the raising of the necessary money by taxation for the support and maintenance of the schools under

the jurisdiction of the board of education. In this act we see a recognition that the Free Academy was a part of the common school system of the city of New York. By chapter 264 of the Laws of 1866 the Free Academy became a separate and distinct organization and body corporate, to be known as " ' The College of the City of New York,' and as such shall have the powers and privileges of a college, pursuant to the Revised Statutes of this State, and be subject to the provisions of the said Statutes relative to colleges, and to the visitation of the Regents of the University, in like manner with the other colleges of the State." The members of the board of education became *ex officio* the trustees of the college, and all acts of the Legislature then in force in regard to the Free Academy and to its control, management, support and affairs, not inconsistent with the act, were to continue in force and were declared to be applicable to the college. This act, in reality, was little more than a change of name. The character, scope and purpose of the institution were not changed. It did not thereby become a private corporation, but remained an agency of the city, acting through the board of education, to secure to the children of the city the benefit of a free collegiate education. Chapter 637 of the Laws of 1866 authorized and directed the board of supervisors of the county of New York to raise and collect by tax such sum, not exceeding $125,000 in any one year, as may be annually reported to them by the trustees of the College of the City of New York for the support, maintenance and general expenses and for the salaries of professors and officers, etc., of said college. This act was amended by chapter 471 of the Laws of 1872 so as to increase said sum to $150,000. In 1872 the president of the college became *ex officio* a trustee of the college. (Laws of 1872, chap. 631.) By chapter 143 of the Laws of 1882 the benefit of free education in the City College was extended " to all male students residing in the city of New York, who shall pass the preliminary examination for admission prescribed by the said board of trustees." By the Consolidation Act of 1882 (Laws of 1882, chap. 410, § 1055 *et seq.*) the various preceding statutes were consolidated, continuing the College of the City of New York without change of legislative provision, except that the limited amount to be raised by tax was required to be reported to the board of estimate and apportionment of the city of New York, and by subdivision 20 of section 194 of the Consolidation Act such sum was required to be raised and appropriated. In 1896 the limit of appropriation was fixed at $175,000. (See Laws of 1896, chap. 398, amdg. Consolidation Act, § 1059.)

In the Greater New York charter (Laws of 1897, chap. 378)

section 1127 *et seq.* continued said college with like powers and duties, except that by chapter 757 of the Laws of 1900 (amdg. §§ 1128, 1132) the board of trustees was changed to nine residents of the city, to be appointed by the mayor, together with the president of the board of education of the city *ex officio* and the president of the college *ex officio*, but provision was made for eliminating the president of the college when the president then in office vacated the same, and section 230 provided: " The board of estimate and apportionment shall annually include in its final estimate the following sums, which shall annually be raised and appropriated: * * * Twentieth. Such sum as may be required by the trustees of the College of the City of New York, pursuant to section eleven hundred and thirty-one of this act." This subdivision in the revision of the charter (Laws of 1901, chap. 466) was not re-enacted as such but the provisions of section 1131 for the annual appropriation, with changed phraseology due to the reorganized city government, was carried into section 1131, and by section 1128 of the revised charter a board of nine trustees were to be appointed by the mayor, who, with the president of the board of education *ex officio*, were to be the trustees of the college; otherwise there was little change in the former statutory provisions. The provisions regulating the appointment of trustees and their powers and duties and providing for the raising of funds to support the college have been since modified and the amount required to be raised therefor on report by the trustees of the college is now based primarily upon a prescribed percentage of the assessed valuation of the real and personal property in the city of New York, with power given to act upon estimates in excess thereof. (See Revised Charter, § 1128, as amd. by Laws of 1914, chap. 119, and Laws of 1915, chap. 512; Id. § 1131, as amd. by Laws of 1918, chap. 583.) The trustees have been permitted to furnish gratuitously or otherwise certain special courses as therein prescribed to male and female students. (See Revised Charter, § 1132, as amd. by Laws of 1915, chap. 161, and Laws of 1916, chap. 580.)

The establishment of the Free Academy for the higher education for boys, and the necessity for similar opportunity for girls, accentuated by the need of educating female teachers, led to an agitation by the city authorities for the establishment of the Normal College. In 1854 the Legislature, by chapter 101 of the laws of that year, amended the act of 1851 relative to common schools in the city of New York by providing that the board of education shall have power, among other things, " To continue the existing Free Academy, and organize a similar institution for

females, and if any similar institution is organized by the board of education, all the provisions of this act, relative to the Free Academy, shall apply to each and every one of the said institutions, now existing or hereafter established, as fully, completely and distinctly as they could or would if it was the only institution of the kind; to distinguish each existing and future institution by an appropriate title."

By chapter 692 of the Laws of 1871 the comptroller of the city of New York was authorized and directed to issue stock to be designated Normal School Fund Stock of the City of New York, for a sum to be expended in the erection of a suitable building for the Normal College. The Consolidation Act (Laws of 1882, chap. 410, § 1027, subd. 8) contained provisions identical with the act of 1854 (*supra*). Chapter 580 of the Laws of 1888 provided:

" Section 1. The Normal College of the City of New York is hereby declared to be a separate and distinct organization and body corporate, and as such shall have the powers and privileges of a college pursuant to the Revised Statutes of this State, and be subject to the provisions of the said Statutes relative to colleges, and to the visitation of the Regents of the University, in like manner with the other colleges of the State."

Section 5 made it the duty of the trustees of said college annually on or before a specified date to report to the board of estimate and apportionment not to exceed a named amount which they might require for payment of the salaries of the professors and officers of the college and for other purposes; and the board of estimate and apportionment were authorized to collect the amount so reported by taxation. This section was amended by chapter 514 of the Laws of 1894, so as to increase said limited amount which was likewise directed to be annually appropriated. Section 6 of the act of 1888 provided that " The said board of education as trustees of said college shall continue to furnish through the Normal College of the City of New York, the benefit of education gratuitously to girls who have been pupils in the common schools of the said city and county for a period of time to be regulated by the board of trustees of said college, and to all other girls who are actual residents of said city and county and who are qualified to pass the required examination for admission to said college."

The provisions of this act were continued without substantial change in both the original and the revised Greater New York charter (Laws of 1897, chap. 378; Laws of 1901, chap. 466) as sections 1139 to 1143, and as sections 1144 and 1145, and were amended by the latter act. Subdivision 21 of section 230 of the charter of 1897 made it mandatory on the board of estimate and

apportionment to appropriate annually "such sum as may be required by the trustees of the Normal College, in the city of New York, pursuant to the provisions of section eleven hundred and forty-two of this act." This subdivision was not re-enacted as such in the revised charter of 1901, but section 1142 of the charter of 1897, providing for the annual report of such limited amount and directing that said amount should be raised and collected by tax, was re-enacted as section 1142 in the revised charter of 1901 with changed phraseology due to the reorganized city government. The name of the college was changed to Hunter College of the City of New York. (See Revised Charter, § 1139, as amd. by Laws of 1914, chap. 115.) By chapter 516 of the Laws of 1915 section 1140 of the revised charter, providing for the trustees of said Normal or Hunter College, was repealed and a new section 1140 was thereby added to said charter whereby the trustees were to consist of nine residents of the city, men and women, to be appointed by the mayor, together with the president of the board of education of the city *ex officio* and the president of said college *ex officio*. The powers under said section 1140 were enlarged by chapter 193 of the Laws of 1916. By chapter 512 of the Laws of 1918 (amdg. Revised Charter, § 1143) said college was required to continue to furnish the benefit of education gratuitously to girls but greater powers were granted and the trustees were permitted also to furnish gratuitously or otherwise certain special courses as therein prescribed for female and male students.

From this historical review of the legislation it appears that the Legislature has declared, at the instance of the citizens and officials of the city of New York, that within that city shall be provided institutions for the higher education of the youth of the city other than that afforded by the common schools, as an extension of, and supplementary to, the merely elementary education. Furthermore, that control, management and fixation of salaries shall be vested in a board of trustees, who shall be public officials appointed by the mayor of the city, and that it shall be mandatory on the officials of the locality charged with the duty of raising the funds and making appropriations, to raise them by local taxation and appropriate the sum that the trustees had reported as necessary for the payment of salaries to the teaching staff and other employees of such institutions. The public policy thus declared by the Legislature was ratified and confirmed by the people of the city.

The education of the youth of the State has always been recognized as one of the principal obligations of an American State. The assessment of the taxes to support the schools within

the various localities has always been considered taxation for the purposes of the locality. It is not now and never has been contended that the appropriation of the funds of a county, city, town or village for the support of schools was not for one of the "county, city, town or village purposes" within article 8, section 10, of the Constitution of the State of New York. This constitutional provision was first adopted in 1874 to take effect January 1, 1875. (See Const. 1874, art. 8, § 11; Const. 1894, art. 8, § 10, as amd. in 1899, 1905, 1907, 1909 and 1917.) We are not required to resort to the citation of authority for a definition of the words "a city purpose." As we have heretofore quoted from Cooley on Taxation the questions that have arisen as to the duty to supply the means of public education have "related not to the existence of the duty, but to its extent. But the question of extent is one of public policy, and addresses itself to the Legislature and the people, not to the courts." In *People ex rel. Murphy* v. *Kelly* (76 N. Y. 475, 489) it is said: "But as the dividing line between what is a municipal purpose and what is not is in many cases shadowy and uncertain, great weight should be given by the courts to the legislative determination, and its action should not be annulled, unless the purpose appears clearly to be one not authorized." We have, therefore, not alone the expressed policy of the Legislature and the people, but the practical interpretation of the Legislature and city officials for the past seventy years, in the various acts continuing the institutions so established and in exercising the powers granted without question. This practical construction is entitled to great weight. (*People ex rel. Einsfeld* v. *Murray*, 149 N. Y. 367, 376.) Therefore, unless there is some limitation upon the extension of free education beyond that provided by the common schools, we are bound to recognize and enforce the legislation.

The appellants claim that there is such a limitation implied in article 9, section 1, of the Constitution: "The Legislature shall provide for the maintenance and support of a system of free common schools, wherein all the children of this State may be educated."

This is not a limitation of authority, but the imposition of a duty. In construing a similar provision in the Constitution of Pennsylvania (Penn. Const. 1838, art. 7, § 1)* the Supreme Court of that State said: "The error consists in supposing this to define the maximum of the legislative power, while in truth it only fixes the minimum. It enjoins them to do thus much, but does not forbid them to do more. If they stop short of that point, they fail in their duty; but it does not result from this that they have

---

* See Penn. Const. 1874, art. 10, § 1.— [REP.

no authority to go beyond it." (*Commonwealth* v. *Hartman*, 17 Penn. St. 118, 120.)

Also, the Court of Appeals of Kentucky, in construing a similar provision in the Constitution of that State (Ky. Const. 1850, art. 11, § 1),* said: " In our opinion, this article of the Constitution, when all of it is considered, and especially when read in the light of its history, the mischief intended to be remedied, and the practical construction which has been given to it, does not forbid aid by the State to an educational institution other than a common school, if the Legislature, in its wisdom, sees fit to extend it. The framers of it and the people adopting it were moved, not by a fear of too much education, but of too little, by a future diversion of the school fund to other purposes." (*Higgins* v. *Prater*, 91 Ky. 6, 18.)

There is nothing contrary to these holdings in *Gordon* v. *Cornes* (47 N. Y. 608, 616), relied upon by the appellants. That case distinctly upheld the provision of an act of the Legislature providing for the establishment of a normal school in a village and the imposition of a tax to secure funds for the purchase of the property and erection of a building, but held that an appropriation from the income of the common school fund of the State of a certain sum annually for the support of the school violated section 1 of article 9 of the Constitution of 1846, which is section 3 of article 9 of the Constitution now in force, which declared that the capital of the common school fund shall be kept inviolate, and that its revenues shall be applied to the support of the common schools. The court held, however, that this provision was severable and did not render the entire act unconstitutional.

I am, therefore, of opinion that the acts providing for the establishment and support of these institutions were a constitutional exercise of power by the Legislature, and having been ratified and confirmed by the people of the locality affected, cannot be successfully questioned.

In 1921 the Legislature passed an act (Chap. 120, adding subd. C to Education Law, § 883, added by Laws of 1919, chap. 645, as amd. by Laws of 1920, chap. 680) in relation to these colleges, which applies to salaries in cities of the first class having a population of one million or over and which is assailed on other than the general grounds which have heretofore been considered. That act amended the Education Law by establishing a classification and schedule of the salaries to be paid to the officers of administration and instruction and other employees of any college in which the compensation and salaries are paid directly or indirectly out of

---

* See Ky. Const. 1891, § 183.— [REP.

moneys appropriated by the board of estimate and apportionment or like financial authority of such city of one million inhabitants or more. Also it provided that the board of trustees of such institution shall adopt schedules which shall fix the compensation or salaries of the members of the teaching and supervising staffs and other employees according to the provisions of this act; that they shall make up their payroll budgets in amounts sufficient to cover compensation for all persons appointed by them, at rates in accordance with the provisions of the act. The act further provides that the board of estimate and apportionment shall, in addition to providing and making appropriation for all other requirements of such institution, appropriate annually, and at other times when necessary, an amount or amounts sufficient to pay the salaries fixed in accordance with the provisions of this act; and shall pay such salaries to the persons employed in such institutions.

The appellants attack this act on the ground that it confers local legislative powers on the board of trustees of the City College and of Hunter College in violation of article 3, sections 26 and 27, and article 10, section 2, of the Constitution of the State of New York. In the argument on this point the corporation counsel has failed to recognize the distinction between the delegation of power to make the law, which necessarily involves a discretion as to what it shall be, and conferring an authority or discretion as to its execution to be exercised under and in pursuance of the law. The first cannot be done; to the latter no valid objection can be made. (*Cincinnati, W. & Z. R. R. Co.* v. *Comrs. of Clinton Co.,* 1 Ohio St. 77, 88.) It has been repeatedly held that the Legislature can fix a standard, or limitations within which rates or salaries may be fixed, and delegate the power to an administrative body to fix rates or salaries, according to the standard or within the prescribed limits. The delegation of power to a Public Service Commission to fix reasonable rates and require adequate service has been practiced in many States, and the constitutionality of the laws upheld. The authorities are collated and discussed by Chief Judge CULLEN in *Village of Saratoga Springs* v. *Saratoga Gas, etc., Co.* (191 N. Y. 123, 136–147). The delegation of power upon police commissioners to fix the salaries of their appointees within fixed limits was upheld and authorities sustaining such delegation are collated and discussed in *Arnett* v. *State ex rel. Donohue* (168 Ind. 180, 183–186). The principle is so well settled that further citation of authority is not necessary.

That the legislation is mandatory on the board of estimate and apportionment to appropriate the amount required by the trustees of the colleges to meet the salaries and other expenses

cannot be successfully urged against its validity. (*Matter of McAneny* v. *Board of Estimate, etc.,* 232 N. Y. 377, 386 *et seq.*) The object of this provision is obvious — it is to enable the colleges properly to discharge their duties as educational institutions. Education is of vital concern to the State. That the usefulness of these institutions may not be impaired and the funds needed for their proper maintenance and support devoted to other uses, that they may be free from arbitrary control through the power of withholding appropriations until some exaction of the appropriating power is complied with, that those hostile to their purposes may not destroy them, it was necessary that the trustees should be given power to fix the amount and the board of estimate be required to make the required appropriation, in order that they might be able to regulate their own affairs and insure proper supplies of money, so that they could discharge their obligations to the students and the public. Salaries have been fixed within the maximum and minimum limitations.

There is one other question presented which relates to the City College alone. In 1907, pursuant to resolutions and appropriation therefor, the city purchased a lot and residential building to be occupied by the president of the college. It has been so occupied ever since. The city now seeks to charge as a part of the president's compensation the rental value of that building. Mr. Justice MULLAN at Special Term has properly disposed of this contention as follows: " The statute speaks merely of money compensation. The board of estimate in 1907 authorized the purchase of the house in question for the express and stated purpose of providing a residence for the president, and the building has been occupied continuously since that year by successive presidents of the college. There was, apparently, no hint or thought of a rental charge; and I think it is quite evident that it was the intention of the various city officials who had to do with the matter to follow a custom, very prevalent throughout the country, of providing for the head of an institution of higher learning a residence on or near the grounds of the institution so as better to enable him to perform the onerous and time-exacting duties of his office. I hold that the city's point in this regard is not well taken." (120 Misc. Rep. 314.)

The orders should be affirmed, with ten dollars costs and disbursements.

CLARKE, P. J., SMITH, MERRELL and McAVOY, JJ., concur.

In each case order affirmed, with ten dollars costs and disbursements.